FILED

2006 OCT 16  AM 9: 00

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

LUZ REYNOSO,

    Plaintiff,

 v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 05-CV-0546-W (JMA)

ORDER GRANTING
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT [DOC.
NO. 15], DENYING
DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT
[DOC. NO. 21], AND
REMANDING CASE FOR
FURTHER PROCEEDINGS

   Plaintiff Luz Reynoso ("Plaintiff") seeks judicial review of Social Security Commissioner Jo Anne B. Barnhart's determination that she is not entitled to widow's insurance benefits.

   The parties have filed cross-motions for summary judgment. Pursuant to 28 U.S.C. § 636(b)(1)(B) and Civil Local Rule 72.1(c)(1)(c), the motions were originally referred to Magistrate Judge Jan M. Adler for a Report and Recommendation. The Court hereby withdraws the referral and finds these matters suitable for determination. As set forth below, the Court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's cross-motion for summary judgment, and remands the case for further proceedings.

# I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability-based widow's insurance benefits pursuant to Title II of the Social Security Act on June 29, 1998. (Transcript ["Tr."] 71–73.)  Plaintiff's claim was denied initially on March 14, 2000, and again upon reconsideration on July 23, 2001. (Tr. 33–36, 39–40.)  On October 1, 2002, Administrative Law Judge James S. Carletti ("ALJ") conducted an administrative hearing. On December 16, 2002, the ALJ issued an opinion concluding that Plaintiff was not disabled and thus was not entitled to disability-based widow's insurance benefits. (Tr. 24–30.)  The Appeals Council for the Social Security Administration declined to review the case. (Tr. 5–7.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

# II. FACTUAL BACKGROUND

Plaintiff was born in Mexico on March 7, 1947, and was 55 years old at the time of the administrative hearing. (Tr. 74, 372.)  She received a University degree in Mexico in 1983. (Tr. 105.)  She worked for the federal government in Mexico as a clerk (1980–89), legal assistant (1989–93), and development coordinator (1993–95). (Tr. 105.)  In her role as a development coordinator, she conducted environmental law studies and inspections, which involved both field work and desk work. (Tr. 372–73.)[1]

Plaintiff sustained head and neck injuries in a motor vehicle accident on January 30, 1990. (Tr. 132, 134, 376.)  She then sustained a lower back injury when a co-worker apparently pushed her down a flight of stairs at work on August 19, 1991. (Tr. 363, 377.)  She returned to work after each incident. However, on October 3, 1995, she stopped working due to the effects of her pain and medications. (Tr. 72, 101, 372.)  She alleges disability due to three herniated discs in her neck, lower back pain, migraines, depression, and anxiety. (Tr. 101, 111, 376–77.)

---

[1] Some evidence suggests Plaintiff was an attorney for the Mexican government. (Tr. 121, 141.)

## III. WIDOW'S INSURANCE BENEFITS

In order to qualify for widow's insurance benefits, Plaintiff must establish that she was under a disability which began before **July 31, 1999**, which is the close of the eighty-fourth month (i.e., seven years) following the death of the wage earner—her husband, Vincent Milbauer—which occurred on July 15, 1992.  <u>See</u> Tr. 371; 42 U.S.C. § 402(e)(1)(B), (e)(4); 20 C.F.R. § 404.335(c)(1).  Because Plaintiff worked until October 3, 1995, and thus could not be considered disabled at any time before that date (<u>see, e.g.</u>, 20 C.F.R. § 404.1520(a)(4)(i); <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098–99 (9th Cir. 1999)), Plaintiff must establish that she was under a disability which began between October 4, 1995 (i.e., the day after she stopped working) and July 31, 1999 (i.e., seven years following the death of her husband).

## IV. MEDICAL EVIDENCE

Plaintiff resides in Mexico and received the majority of her medical treatment in Mexico.  A summary of the medical evidence contained in the administrative record, as translated into English, follows.  Notably, the record does not appear to be complete as there are clearly many missing medical reports.

**A.    Dr. Cesar A. Garcia de Llano Valenzuela: Treating Physician (1989–92)**

Plaintiff testified at her administrative hearing that Dr. Cesar A. Garcia de Llano Valenzuela, a neurosurgeon, treated her from 1989 to 1992. (Tr. 378–80.) The only medical documentation from Dr. Valenzuela in the record from this time period indicates that Dr. Valenzuela evaluated Plaintiff in March 1990 due to her history of intense chronic migraines since the age of 9, and due to the injuries she sustained in her car accident. (Tr. 139, 363.)  At that time, Dr. Valenzuela opined that Plaintiff was not totally permanently disabled. (Tr. 139.)

//

//

3

05cv0546

**B.    Dr. Rodrigo Ramos Zuñiga: Treating Physician (1992–94)**

Plaintiff testified at her hearing that Dr. Rodrigo Ramos Zuñiga, a neurosurgeon, treated her from 1992 to 1994. (Tr. 378.)  According to the medical evidence in the record, Dr. Zuñiga examined Plaintiff in November 1992, when she reported that she had experienced neck pain for over two years, and had received only limited results with rehabilitation.  (Tr. 141.)  Dr. Zuñiga opined that Plaintiff's diagnosis was "good for life, limited for function."  (Id.)

**C.    Dr. Ricardo Ruiz Aguilar: Treating Physician (1994, 2000)**

Plaintiff saw Dr. Ricardo Ruiz Aguilar, an orthopedist, in February 1994.  He noted that Plaintiff's car accident resulted in cervical pain with radiation to the right upper extremity, pain in Plaintiff's cervical column with pain radiating to the right upper extremity, and paresis (slight paralysis) and paresthesia (tingling) in the left upper extremity.  (Tr. 164.)  He opined that Plaintiff's prognosis was "good for life, limiting for work."  (Id. at 164, 251.)  He further stated that Plaintiff's work ability was limited due to the presence of irreversible arthrosis of the cervical spine.  (Id.)  Dr. Ruiz also provided a prescription in 2000, as well as a medical source statement regarding Plaintiff's residual functional capacity in October 2001, which indicates at most, a very limited ability to work.  (Tr. 313, 285–89.)

**D.    Dr. Francisco Renteria Ramirez: Treating Physician (1994–2000)**

Plaintiff testified that her primary treating physician between 1994 and 2000 was Dr. Francisco Renteria Ramirez, an internist.  (Tr. 380.)  In April 1995, Dr. Renteria prepared a medical report in which he indicated that Plaintiff had been treated with medication for a depressive syndrome since 1986.  (Tr. 203.)  He further observed that Plaintiff had a migraine condition, cervical radiculopathy, neck pain, degenerative joint disease of the lumbar column, allergic rhinitis, vertigo, recurrent

1   urinary infection, spastic colon, fibromyalgia, and chronic hepatitis.  (Tr. 203-04.)[2]

2   Dr. Renteria also provided a medical source statement regarding Plaintiff's residual

3   functional capacity in October 2001, indicating at most, a very limited ability to work.

4   (Tr. 294–97, 400–01.)

5

6   **E.     Dr. Desiderio Valdez Zepeda: Examining Physician (1996–2001)**

7           Plaintiff testified at her hearing that Dr. Desiderio Valdez Zepeda, a

8   neurosurgeon, was the first to recommend surgery for her neck. (Tr. 381.) She stated

9   that Dr. Valdez was not her treating physician but rather was an "expert" who had

10  been ordered to evaluate her.  (Tr. 382–83.)[3]  Plaintiff testified that she saw Dr.

11  Valdez in 1996, approximately six times between 1996 and 2001, and three times in

12  2001. (Id.)

13          After reviewing Plaintiff's medical records and conducting two clinical

14  examinations in August 1996, Dr. Valdez prepared a report concluding that Plaintiff

15  had suffered neck pain with radiculopathy since 1986 with objective signs, on MRI,

16  of osteodegenerative changes at C3-4, C4-5, and C5-6, which required surgical

17  resolution with multidisciplinary assistance.  (Tr. 152, 189, 208.)  If her pathology

18  continued, it could in his opinion cause total and permanent disability, including

19  death, at the level of the cervical medulla cord which would affect respiration,

20  movement, and sensibility of the four extremities.  (Id. at 152.)  Dr. Valdez also

21  provided a medical source statement regarding Plaintiff's residual functional capacity

22  in August 2001, indicating at most, a very limited ability to work.  (Tr. 355–59.)

23  //

24  //

25  //

26  ─────────────────

27      [2] Nerve conduction studies performed in November 1993 and January 2001 confirmed the
    existence of radiculopathy at C6.  (Tr. 160, 259.)

28      [3] The letterhead of Dr. Valdez's report indicates "Institute of Security and Social Services of State
    Workers."  (Tr. 146.)

**F.   Dr. Rene Alcocer Godinez: Examining Physician (1997)**

In October 1997, Dr. Rene Alcocer Godinez, an orthopedic surgeon for the Government of Jalisco, Mexico, prepared a report recommending that Plaintiff not undertake any sports activities or work involving physical contact or heavy machinery. (Tr. 217, 219.)  In his opinion, any incapacity due to Plaintiff's cervical symptoms should be temporary and should last approximately twelve weeks. (Tr. 219.)  He added, however, that if evidence of radiculopathy through disc herniation persisted, Plaintiff would require surgical treatment. (Id.)  Dr. Alcocer also provided a medical source statement regarding Plaintiff's residual functional capacity in May 2001, which indicated the continued existence of radiculopathy as well as at most, a very limited ability to work. (Tr. 303–06.)

**G.   Dr. Artemio A. Vazquez Torrez: Treating Physician (1998–99)**

Plaintiff underwent a consultation with Dr. Artemio A. Vazquez Torrez, of geriatrics and general medicine, in June 1998. (Tr. 143.)  At that time, Plaintiff complained of neck pain, occipital headaches, vertigo, nausea, nervousness, depression, anxiety, insomnia, generalized fatigue, and pain in the arms, shoulders, wrists, fingers, and knees. (Id.)  Dr. Vazquez recommended that Plaintiff continue taking Tegretol, Fasicam, and Ponstam tablets, and that she be reevaluated by a neurosurgeon regarding her neck problems.  He concluded that Plaintiff had a good prognosis for life, but a limited one for function. (Id.)  Dr. Vazquez also prescribed various medications to Plaintiff in 1998 and 1999. (Tr. 315–20.)

**H.   Dr. Jesus Machado-Salas: Examining or Treating Physician (1999)**

Plaintiff underwent a consultation with Dr. Jesus Machado-Salas, a brain and spine surgeon, in November 1999. (Tr. 230.)  He diagnosed post-traumatic chronic cervicocephalobrachialgia, post-traumatic chronic lumociatalgia, chronic pain, anxiety, and depression. (Id.)  He noted that due to economic reasons, Plaintiff could

6

afford to pay only for simple x-ray studies of her cervical and lumbosacral regions, but that the findings on these x-rays supported his diagnoses.  (Id. at 228, 230.)  He also stated the following:

> Her current painful state notoriously interferes with her everyday activities.  She [cannot] have a job, neither to exercise, or even to have a good rest or sleep.  She requires a large amount of analgesics, which have triggered chronic gastritis.  She requires neurosurgical treatment.

(Tr. 230.)

## I.    Dr. Enrique Corral Escareno: Examining Physician (1999)

Dr. Enrique Corral Escareno, an eye surgeon, examined Plaintiff in November 1999.  (Tr. 238.)  He diagnosed her with myopia and astigmatism.  The rest of her examination was within normal limits.  (Id.)

## J.    Dr. Carlos Peralta Ramirez: Treating Physician  (1999)

Dr. Carlos Peralta Ramirez, a dental surgeon, evaluated Plaintiff in November 1999.  (Tr. 234, 236.)  He noted that Plaintiff had been treated for severe paradental problems as a consequence of her car accident.  (Tr. 234.)  He also observed that Plaintiff had been diagnosed with nonspecific chronic ulcerative colitis which considerably limited her use of drugs.  (Tr. 236.)

## K.    Dr. Ernesto Fernandez: Consultative Examiner (1999)

Dr. Ernesto Fernandez, an orthopedic surgeon, evaluated Plaintiff in December 1999 at the request of the San Diego office of the Department of Social Services.  (Tr. 240.)  Plaintiff's chief complaint was of neck pain, which she had experienced for over nine years since her car accident.  (Id.)  Prior treatments, including pain pills, muscle relaxants, anti-inflammatory medications, a cervical collar, and cervical traction, provided some relief.  (Id.)  Dr. Fernandez reported that Plaintiff's neck pain radiated into all areas of her body, including both arms, between the shoulders, her lower back,

05cv0546

and both legs. (Tr. 241.) Plaintiff also complained of numbness in her hands and fingers, headaches, fatigue, depression, and disturbed sleep. (Id.)

Dr. Fernandez conducted a physical examination of Plaintiff, but did not have any of her prior diagnostic images or medical reports available to him. (Tr. 248–49.) He concluded that Plaintiff had diagnoses of cervical disc degeneration at C4-5 and C5-6, chronic cervical pain syndrome, lower back pain/lumbar syndrome, history of ulcerative colitis, psoriasis, and possible related arthritis. (Tr. 249.) He found that Plaintiff could work on a sustained basis, at a light work level, and provided a detailed residual functional capacity analysis. (Id.)

**L.    Dr. Marisela Parra Bernal: Treating Physician (1998–2001)**

According to the record, Dr. Marisela Parra Bernal, a neurologist, treated Plaintiff between 1998 and 2001, and perhaps longer. (Tr. 222, 309–10, 321–22, 351.) In February 2001, Dr. Parra diagnosed her with radicular compression at C6, herniated discs that affected the exit of the cervical roots, and degenerative changes with secondary root compression. (Tr. 351.) She opined that Plaintiff's condition had become chronic and disabling, with pain, paresthesia, and decrease of strength and hypertrophy of the right upper extremity. (Id.) Dr. Parra also provided a medical source statement regarding Plaintiff's residual functional capacity in August 2001, indicating at most, a very limited ability to work. (Tr. 298–302.)

**M.    Dr. Cesar A. Garcia de Llano Valenzuela: Treating Physician (2001)**

In September 2001, Dr. Valenzuela, who treated Plaintiff between 1989 and 1992 (supra at IV.A), prepared a report in which he indicated that Plaintiff's disability had progressed from moderate, in January 1990, to severe. (Tr. 363.) He noted that Plaintiff did not experience any improvement in her symptoms from treatment received between 1992 and 1999. (Id.) He diagnosed Plaintiff with herniated discs at C3-4 and C4-5; multi-segmented cervical instability from C2 to C7; multiple dorsal

8

1  spondylosis with herniated disc at T11-12; lumbar column instability with herniated
2  disc at L5-S1, causing radiculopathy at L5; and migraines. (Tr. 364.) Dr. Valenzuela
3  opined that Plaintiff's physical activities were limited due to weakness and motor
4  difficulties, and that her migraines and chronic pain rendered her mentally
5  incapacitated. (Id.) He stated further that Plaintiff was at high risk for permanent
6  injury due to her herniated discs at C3-4 and T11-12, and that any increase in the size
7  of the disc herniations could cause irreversible damage such as quadriplegic or
8  paraplegic injuries, or even death due to respiratory paralysis. (Id.) He recommended
9  that Plaintiff undergo surgical treatment as soon as possible. (Id.) Dr. Valenzuela also
10 provided a medical source statement regarding Plaintiff's residual functional capacity
11 in October 2001, indicating at most, a very limited ability to work. (Tr. 290–93.)
12
13 **N.    Dr. Kenneth Adam McKillian: Treating Chiropractor (2002)**
14        Plaintiff testified that Dr. Kenneth Adam McKillian, a chiropractor located in
15 Chula Vista, California, treated her for "many months." (Tr. 375.) In January 2002,
16 Dr. McKillian completed a disability slip indicating that Plaintiff was totally
17 incapacitated from October 2001 to the present due to lumbar disc herniations that
18 caused pain down her legs and into her feet. (Tr. 308.) Dr. McKillian also provided
19 a medical source statement regarding Plaintiff's residual functional capacity in March
20 2002, indicating at most, a very limited ability to work. (Tr. 126–29.)
21
22              **V.  THE ADMINISTRATIVE HEARING**
23 **A.    Plaintiff's Testimony**
24        Plaintiff, who was represented by counsel and assisted by an interpreter, testified
25 at the administrative hearing. She testified that she stopped working in October 1995
26 because she "had to take controlled medications that wouldn't let [her] think." (Tr.
27 373.) She had also lost the ability to bend her head down and write, and did not have
28 the strength to carry her books or materials. (Tr. 373, 377.) Her lower back pain had

05cv0546

1 worsened since 1995 and her neck pain had worsened since 1999. (Tr. 376, 384.) In

2 early 1999, she could not lift a half-gallon of milk and could walk for only ten minutes.

3 (Tr. 384-85.) Her neck pain, in 1999, was 10 on a scale of 1 to 10. (Tr. 385.) She

4 did not have the surgery that had been recommended to her in 1996 and 1997

5 because she did not have the money for it. (Id.) Additionally, there were differing

6 opinions about the surgery: One doctor recommended it, but another did not. (Id.)

7 She has also had foot problems since 1998 or 1999. (Tr. 387.)

8

9 **B.     Medical Expert Testimony**

10     Medical expert ("ME") witness Eric C. Yu, M.D., board-certified in orthopedic

11 surgery (Tr. 64), also testified at the hearing. He testified that based on the record,

12 Plaintiff had a cervical spine condition secondary to degenerative and discogenic disc

13 disease, which had been treated since 1990. (Tr. 392–93.) In December 1999, Dr.

14 Fernandez, the consultative examiner retained by the Department of Social Services,

15 determined that Plaintiff was limited to light work. (Tr. 393.) In 2001, Drs. Valdez

16 and Valenzuela found that Plaintiff's residual functional capacity ("RFC") was less

17 than sedentary.   (Id.)   A 2001 MRI showed probable worsening of Plaintiff's

18 condition. (Tr. 253, 394.)

19     The ME testified that Plaintiff's RFC in July 1999 was in the light category,

20 based upon Dr. Fernandez's opinion, which was closest to 1999. (Id.) He disagreed

21 with the opinion of Dr. Salas, whose physical examination revealed no report of any

22 sensory loss, and his observed loss of power in all four extremities was not

23 corroborated by Plaintiff's 1995 cervical MRI. (Tr. 395-98.) The ME's impression

24 was that Plaintiff's condition worsened in 2001. (Tr. 398–99, 402.) He testified that

25 the findings in the 2001 MRI were not present in the 1995 MRI. (Tr. 402.) The ME

26 refused to speculate why Plaintiff's condition worsened. (Id.)

27 //

28 //

## C.   Vocational Expert Testimony

Vocational expert ("VE") witness Alan E. Cummings also testified at the hearing.   He testified that Plaintiff's previous work as a development coordinator/investigator would be classified as "light, skilled" and her previous clerical work fell into the "general clerk" category and would be classified as "light, semiskilled." (Tr. 403.) He acknowledged that there was little information about how Plaintiff's previous work was actually performed.   (Id.)

# VI.  THE ALJ DECISION

After considering the record, ALJ Carletti made the following findings:

1.   The claimant meets all of the nondisability requirements for Disabled Widow's Insurance Benefits . . . .   The claimant's prescribed period begins July 15, 1992 and ends July 31, 1999.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.   The claimant has cervical degenerative disc disease, with herniated discs at C3-4 and C4-5, which is a severe impairment, based upon the requirements in the Regulations . . . .

4.   This medically determinable impairment does not meet or medically equal one of the listed impairments [in the Social Security Regulations].

5.   The undersigned finds the claimant's allegations regarding her limitations prior to July 31, 1999, are not totally credible for the reasons set forth in the body of the decision.

6.   The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment . . . .

7.   On and prior to July 31, 1999, the claimant had the residual functional capacity to perform light work activity, as defined in the Regulations.

8.   The claimant's past relevant work as a clerk did not require the performance of work-related activities precluded by her residual functional capacity on and prior to July 31, 1999 [citation omitted].

9.   The claimant's medically determinable severe impairment did not prevent the claimant from performing her past relevant work on or prior to July 31, 1999.

11

05cv0546

1    10.   The claimant was not under a "disability" as defined in the Social
          Security Act, at any time through July 31, 1999 [citation
2         omitted].

3   (Tr. 29–30.)

4

5              **VII.  STANDARD OF REVIEW**

6        To receive widow's insurance benefits based on disability, a claimant

7   must be unmarried, between the ages of 50 and 60, and under a disability.  42

8   U.S.C. § 402(e)(1)(A)–(B).  To be under a disability, a claimant must show

9   that (1) he or she suffers from a medically determinable impairment that can

10  be expected to result in death or that has lasted or can be expected to last for

11  a continuous period of twelve months or more; and (2) the impairment renders

12  the claimant incapable of performing the work that he or she previously

13  performed or any other substantially gainful employment that exists in the

14  national economy.  42 U.S.C. § 423(d)(1)(A)–(2)(A).  A claimant must meet

15  both requirements to be "disabled."  Id.  Additionally, a widow must have been

16  under a disability which began before the end of the period beginning, as

17  relevant here, with the month in which the wage earner's death occurred, and

18  ending with the close of the eighty-fourth month following the month in which

19  such period began.  42 U.S.C. § 402(e)(1)(B), (e)(4).

20

21  **A.    Sequential Evaluation of Impairments**

22       The Social Security Regulations outline a five-step process to determine

23  whether an applicant is "disabled."  If an applicant is found "disabled" or "not

24  disabled" at any step, there is no need to proceed further.  Tackett v. Apfel,

25  180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  Although

26  the ALJ must assist the applicant in developing a record, the applicant bears

27  the burden of proof as to the first four steps.  At the fifth step, however, the

28  burden shifts to the Commissioner.  Id.  The evaluation process is as follows:

Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "<u>not disabled</u>" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.

Step 2. Is the claimant's impairment severe? If not, then the claimant is "<u>not disabled</u>" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two, and the evaluation proceeds to step three.

Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three, and the evaluation proceeds to step four.

Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "<u>not disabled</u>" and is therefore not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four, and the evaluation proceeds to the fifth and final step.

Step 5. Is the claimant able to do any other work? If not, then the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits. If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines . . . . If the Commissioner meets this burden, the claimant is "<u>not disabled</u>" and therefore not entitled to disability insurance benefits. If the Commissioner cannot meet this burden, then the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits.

05cv0546

1   Tackett, 180 F.3d at 1098–99 (footnotes and citations omitted).

2

3   **B.    Judicial Review**

4       Sections 205(g) and 1631(c)(3) of the Social Security Act allow

5   unsuccessful applicants to seek judicial review of the Commissioner's final

6   agency decision. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review

7   is limited. The Commissioner's final decision should not be disturbed unless (1)

8   the ALJ's findings of fact are not supported by substantial evidence, or (2) the

9   ALJ failed to apply the proper legal standards. See Flaten v. Sec'y of Health &

10  Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

11      The term "substantial evidence" refers to evidence that a reasonable

12  person might accept as adequate to support the ALJ's conclusion, considering

13  the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971);

14  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence

15  means "more than a scintilla but less than a preponderance" of the evidence.

16  Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997). The Court must

17  consider the record as a whole, weighing both the evidence that supports and

18  detracts from the Commissioner's conclusions. See Mayes v. Massanari, 276

19  F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs.,

20  846 F.2d 573, 576 (9th Cir. 1988). Even if substantial evidence supports the

21  ALJ's findings, they must be set aside if the ALJ failed to apply the proper legal

22  standards in weighing the evidence and reaching his or her decision. See

23  Benitez v. Califano, 573 F.2d 653, 655 (9th Cir. 1978).

24      Section 405(g) permits this Court to enter a judgment affirming,

25  modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The

26  matter may also be remanded to the Social Security Administration for further

27  proceedings.

28  //

## VIII.  DISCUSSION

Plaintiff contends that the ALJ's decision to deny her widow's insurance benefits was legally improper and was not supported by substantial evidence. Plaintiff makes four arguments.  (1) The ALJ failed, during his Step 4 analysis, to evaluate Plaintiff's ability to perform all duties of her past work.  (2) The ALJ failed to resolve a conflict regarding Plaintiff's RFC and her ability to perform light work activity.  (3) The ALJ failed to adequately discount the opinion of disability from Plaintiff's treating physician, Dr. Salas.  (4) The ALJ's reasons for discrediting Plaintiff's allegations of disabling pain were legally insufficient. The Court will address each of these arguments in turn.

### A.  Remand for Further Proceedings Regarding Plaintiff's Past Relevant Work Is Necessary.

Plaintiff first argues that the ALJ failed to properly evaluate her ability to perform all of the duties of her past work, and thus conducted an improper assessment at Step 4 of the disability analysis.  (Pl.'s Mem. at 4–15.)

At Step 4, the burden is on the claimant to show that her impairments render her unable to perform her past relevant work.  See, e.g., Tackett, 180 F.3d at 1098–99; see also DeLorme v. Sullivan, 924 F.2d 841, 849–50 (9th Cir. 1991).  Past relevant work is work that the claimant has performed within the fifteen years prior to the time of adjudication.  20 C.F.R. § 404.1560(b)(1); SSR 82-62, 1982 WL 31386, at *2.[4]

A claimant is "not disabled" if the ALJ determines that he or she retains the RFC to perform either the *actual* functional demands and job duties of a particular past relevant job, or the functional demands and job duties of the occupation *as generally required* by employers throughout the national economy.

---

[4] While Social Security Rulings ("SSR"s) lack the force of law, these rulings constitute the Social Security Administration's official interpretations of the statute it administers and of its own regulations. As such, they are binding on ALJs.  Terry v. Sullivan, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).

05cv0546

1    SSR 82-61, 1982 WL 31387, at *2. <u>See also</u> <u>Pinto v. Massanari</u>, 249 F.3d 840,

2    845 (9th Cir. 2001).  The ALJ must compare his RFC assessment with the

3    physical and mental demands of the claimant's past relevant work.  <u>See</u> 20

4    C.F.R. § 404.1520(f).  Further, under Social Security Ruling 82-62, the ALJ has

5    a duty of inquiry and factual development at Step 4.  <u>See</u> <u>Henrie v. Dept. of</u>

6    <u>Health & Human Servs.</u>, 13 F.3d 359, 361 (10th Cir. 1993); <u>see also</u> <u>Pinto</u>, 249

7    F.3d at 844.    "The claimant is the primary source for vocational

8    documentation, and statements by the claimant regarding past work are

9    generally sufficient for determining the skill level[,] exertional demands and

10   nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3.

11        Here, though, the ALJ failed in his duty of inquiry and factual

12   development with respect to Plaintiff's past work.  The record does not disclose

13   what Plaintiff's past work as a "clerk," "legal assistant," and "development

14   coordinator" actually required. The ALJ adopted these characterizations of her

15   occupation based on the VE's testimony, even though the VE acknowledged

16   that he had very little information about how Plaintiff *actually performed* her

17   prior work.  "Finding that a claimant has the capacity to do past relevant work

18   on the basis of a generic occupational classification of the work is likely to be

19   fallacious and unsupportable."  SSR 82-61, 1982 WL 31387, at *1.  Thus,

20   substantial evidence does not support the ALJ's conclusions with respect to

21   Plaintiff's prior work.  Therefore, the Court remands this matter for further

22   proceedings to determine exactly what Plaintiff's past work consisted of, and

23   what the exertional level of that work actually was.  <u>See</u> <u>Lewin v. Schweiker</u>,

24   654 F.2d 631, 635 (9th Cir. 1981) ("If additional proceedings can remedy

25   defects in the original administrative proceedings, a social security case should

26   be remanded.").

27   //

28   //

## B. On Remand, the ALJ Must Consider the Full Effects of Plaintiff's Work Restrictions.

Plaintiff next argues that the ALJ erroneously determined that Plaintiff had the RFC to perform light work. Specifically, Plaintiff contends that the ALJ did not properly consider the effects of the "alternate sitting and standing" requirement and the limitation on "bending, stooping, and crouching" that Dr. Fernandez, the consultative examiner, placed on Plaintiff's ability to work. (Pl.'s Mem. at 15–21; Tr. 249.)

A claimant's RFC is an assessment of the individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, which means eight hours per day, for five days per week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at *1. An RFC is based on all relevant evidence in the claimant's case record. 20 C.F.R. § 404.1545(a)(1). The RFC is then used at Step 4 and, if necessary, Step 5 of the sequential evaluation process to decide whether the claimant is disabled. SSR 96-8p, 1996 WL 374184, at *2; 20 C.F.R. § 404.1545(a)(5).

Here, the ALJ relied upon the findings of the ME to determine Plaintiff's RFC. The ME, relying on the opinion of Dr. Fernandez, the consultative examiner, found that Plaintiff had the RFC to perform light work. Dr. Fernandez, in turn, concluded as follows:

> This claimant could be expected to stand/walk 8 hours of an 8 hour work day with normal breaks. The condition of lumber syndrome limits sitting to 6 hours in an 8 hour workday. [Plaintiff] must periodically alternate sitting and standing to relieve pain or discomfort. . . . There are limitations on bending, stooping and crouching . . . .

(Tr. 249–50.)

The ME, however, made no mention of the restrictions Dr. Fernandez proposed in his determination that Plaintiff had the RFC to perform light work.

05cv0546

1    Nor did the ALJ elicit any testimony from the ME on these restrictions. "Light"
2    work is defined as work that involves lifting no more than twenty pounds
3    occasionally and no more than ten pounds frequently.   20 C.F.R. §
4    404.1567(b). A job in the "light" category may require a "good deal" of walking
5    or standing, or may involve sitting most of the time with some pushing and
6    pulling of arm or leg controls.  Id.  The definition of "light" work does *not*
7    answer the question of whether someone who must alternate between sitting
8    and standing, or who is limited in his or her ability to bend, stoop, or crouch,
9    can perform light work.

10       If the ALJ, on remand, again credits the ME's opinion—which implicitly
11   incorporates Dr. Fernandez's opinion—he must consider that opinion in its
12   entirety.   In other words, the ALJ must evaluate the effects of the work
13   restrictions Dr. Fernandez's opinion includes.   Only then can the ALJ
14   reasonably conclude whether Plaintiff can perform her past relevant work (Step
15   4) or other work in the national economy (Step 5).

16

17   **C.    Remand for Further Proceedings Regarding Dr. Salas's Opinion Is
         Necessary.**
18

19       Plaintiff next argues that the ALJ failed to explain the basis for
20   apparently discrediting Dr. Salas's opinion.  Dr. Salas, a treating physician,
21   diagnosed Plaintiff with numerous conditions, and opined that they would
22   interfere with Plaintiff's everyday life. (See supra at IV.H.)  Plaintiff argues that
23   the ALJ could not logically cite Dr. Salas's opinion in his decision without
24   either according it some weight or rejecting it outright.  (Id. at 22.)

25       Ninth Circuit law identifies three types of physicians: (1) those who treat
26   the claimant (treating physicians), (2) those who examine but do not treat the
27   claimant (examining physicians), and (3) those who neither examine nor treat
28   the claimant (reviewing physicians).  Lester v. Chater, 81 F.3d 821, 830 (9th

1   Cir. 1995); see also 20 C.F.R. § 404.1527(d). Generally, a treating physician's
2   opinion carries more weight than an examining physician's opinion, and an
3   examining physician's opinion carries more weight than a reviewing physician's
4   opinion. Lester, 81 F.3d at 830. "[W]here the treating doctor's opinion is not
5   contradicted by another doctor, it may be rejected only for 'clear and
6   convincing' reasons" supported by substantial evidence in the record. Id.
7   (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)). If the treating
8   physician's opinion is contradicted by another doctor, it may be rejected only
9   for "specific and legitimate" reasons supported by substantial evidence in the
10  record. Id. (citing Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988)).
11  Reasons for rejecting a treating doctor's opinion on the ultimate issue of
12  disability are comparable to those required for rejecting a treating doctor's
13  medical opinion. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).

14          Here, the record is unclear as to whether Dr. Salas was an examining
15  physician or a treating physician. The sole medical report in the record from
16  Dr. Salas indicates simply that Plaintiff had a consultation with him on
17  November 1, 1999. (Tr. 230.) Although the record does not contain any other
18  reports from Dr. Salas, Plaintiff indicated in a Social Security Administration
19  form in 2001 that Dr. Salas treated her at least once per month. (Tr. 118.)
20  The brief testimony at the administrative hearing regarding Dr. Salas (see Tr.
21  381, 396–98) did not clarify Dr. Salas's role in Plaintiff's medical history.

22          The ALJ apparently rejected Dr. Salas's opinion by citing the ME's
23  opinion, which explicitly disagreed with Dr. Salas's findings. (See Tr. 397.)
24  However, Ninth Circuit law does not permit an implicit rejection of a treating
25  physician's opinion without a concrete rationale and supporting evidence. See,
26  e.g., Embrey, 849 F.2d at 421 ("We have made it clear that the medical
27  opinions of a claimant's treating physicians are entitled to special weight and
28  that, if the ALJ chooses to disregard them, he must set forth specific, legitimate

1   reasons for doing so, and this decision must itself be based on substantial
2   evidence.") (citations and internal quotations omitted); see also Hammock v.
3   Bowen, 879 F.2d 498, 502 (9th Cir. 1989) (finding error in an ALJ's failure to
4   offer any reasons why he disregarded a treating physician's opinions).

5        Because the record leaves some doubt about whether Dr. Salas treated
6   the Plaintiff, the Court cannot determine whether the ALJ addressed his
7   opinion adequately. Again, "[i]f additional proceedings can remedy defects in
8   the original administrative proceedings, a social security case should be
9   remanded." Lewin, 654 F.2d at 635. Accordingly, on remand, if the ALJ
10  determines that Dr. Salas treated the Plaintiff, he may again decide to discount
11  the opinion—but he must provide specific and legitimate reasons based on
12  substantial evidence for doing so. See Embrey, 849 F.2d at 421; see
13  also McAllister v. Sullivan, 888 F.2d 599, 603-04 (9th Cir. 1989) (remanding
14  case for further proceedings including, potentially, the provision of specific and
15  legitimate reasons for disregarding the report of the claimant's treating
16  physician).

17       On remand, the ALJ should also further consider the opinion of Dr.
18  Desiderio Valdez Zepeda, who opined in 1996 that Plaintiff required neck
19  surgery and that her condition, if not resolved, could result in permanent
20  disability or even death. (Tr. 152.) Although Plaintiff did not raise any
21  potential errors by the ALJ regarding his consideration of this opinion, the
22  Court notes that the ALJ did not properly discuss, or even mention, this
23  opinion. Although Dr. Valdez was apparently an "examining" physician, he did
24  see Plaintiff numerous times over a period of years. Additionally, the ALJ
25  should ensure that the record contains any medical reports and records from,
26  at a minimum, Drs. Francisco Renteria Ramirez, Artemio A. Vazquez Torrez,
27  and Marisela Parra Bernal, who were Plaintiff's treating physicians during the
28  time period relevant to this case.

**D.    Remand for Further Proceedings Regarding the Severity of Plaintiff's Pain Symptoms Is Necessary.**

Finally, Plaintiff argues that the ALJ's reasons for discrediting her allegations of disabling pain were legally insufficient.  (Pl.'s Mem. at 23–25.) An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989). However, the ALJ must offer "specific, clear and convincing reasons" in order to reject the claimant's testimony regarding the severity of his or her own symptoms.  Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996).

Here, the ALJ stated the following regarding Plaintiff's credibility:

> Even though it is likely the claimant experiences some intermittent pain and limitations, the undersigned finds the claimant's allegations regarding the intensity, persistence, and limiting effects of her pain on and prior to July 31, 1999, to be in excess of the objective medical findings, and not credible to the extent alleged, for the clear and convincing reasons enumerated below.  First, while the medical record does demonstrate the presence of an underlying medically determinable impairment that could reasonably cause mechanical pain, the objective findings with respect to the claimant's spine are not indicative of intractable pain.  The claimant retained good range of motion, and there was no significant neurologic deficit or spasm. Although there was diagnostic evidence of disc herniation, the medical expert indicated that there was no evidence of nerve involvement, during the pertinent period. Second, the claimant required only conservative treatment, and achieved some relief with medication.  There is no evidence of side effects from any medications.   Third, the claimant did not participate in any significant pain regimen or therapy program.  Fourth, there is no evidence that she needed assistance from others in attending to personal needs or in performing essentially all normal activities of daily living.  Fifth, there is no evidence of severe weight loss because of loss of appetite from pain, and no evidence of severe sleep deprivation because of pain.  Sixth, during the pertinent period, there is no statement by a physician that the claimant experienced severe and unremitting pain.  In fact, at least one examining physician has suggested there was some symptom exaggeration, and the medical expert testified that there was no

1   anatomical basis for the degree of pain alleged. Consequently, the
2   claimant's allegations of disabling pain, excess pain, and limitation
    . . . are not credible to the extent alleged.

3

4   (Tr. 29.)

5       The Court, on the present record, is unable to determine whether the
6   above explanation provides the "clear and convincing" reasons necessary to
7   reject Plaintiff's testimony regarding the severity of her symptoms.  First, the
8   Court finds the record too undeveloped for the ALJ to state definitively that
9   "the claimant required only conservative treatment" or that "the claimant did
10  not participate in any significant pain regimen or therapy program."  The ALJ
11  appropriately drew rational inferences from Plaintiff's treatment history and
12  considered her conservative treatment regimen when assessing her credibility.
13  See Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1464 (9th Cir.
14  1995); Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  But, as previously
15  noted, it is highly likely that there are many other medical records and reports
16  which are not contained in the administrative record.  Plaintiff received
17  extensive medical treatment between 1990, following her car accident, and
18  1999, the end of the relevant period at issue in this case.  Without reviewing
19  substantially more of these records, the ALJ cannot properly conclude that
20  Plaintiff received *only* conservative treatment or that she had not participated
21  in *any* pain regimen or therapy program.

22      Second, the ALJ made no specific findings concerning the transferability
23  of Plaintiff's activities of daily living to her ability to perform work.  Plaintiff's
24  ability to perform daily activities discredits her testimony regarding her pain
25  symptoms only if those activities involve physical functions transferable to her
26  occupation.  See Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990)
27  (stating that a specific finding that a claimant is able to spend a substantial part
28  of the day engaged in pursuits involving physical functions transferable to a

22

1  work setting discredits an allegation of disabling pain); Fair, 885 F.2d at 603
2  ("[I]f a claimant is able to spend a substantial part of his day engaged in
3  pursuits involving the performance of physical functions that are transferable
4  to a work setting, a specific finding as to this fact may be sufficient to discredit
5  an allegation of disabling excess pain."). On remand, the ALJ may discredit
6  Plaintiff's pain testimony due to her participation in "normal daily activities"
7  only if he makes specific findings regarding the nature, duration, similarity, and
8  especially, transferability to occupational functions, of those activities.

9      Finally, the record contradicts two aspects of the ALJ's credibility
10  analysis. One, there was some evidence that Plaintiff's pain resulted in sleep
11  deprivation (see Tr. 241), which is contrary to the ALJ's fifth proffered reason.
12  Two, Plaintiff continually complained to physicians about neck and back pain
13  over the course of many years (see supra at IV), which at least undermines the
14  ALJ's sixth proffered reason.

15      Though Plaintiff bears the burden to prove she is disabled, the ALJ "has
16  a special duty to develop the record fully and fairly . . . even when the claimant
17  is represented by counsel." Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir.
18  2001). When there is "ambiguous evidence or when the record is inadequate
19  to allow for proper evaluation of the evidence," id. at 459–60, the ALJ's
20  conclusions may be premature. Here, the medical evidence is incomplete and
21  inadequate to determine whether Plaintiff was disabled during the relevant
22  period, between October 4, 1995, and July 31, 1999. Accordingly, on remand,
23  the ALJ should develop the record fully on these points. Then the ALJ must
24  reassess the Plaintiff's credibility under the governing law.

25  //
26  //
27  //
28  //

05cv0546

## IX. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment is **GRANTED** and Defendant's Cross-Motion for Summary Judgment is **DENIED**. Pursuant to Section 405(g) of Title 42, this case is remanded to the Social Security Administration for further administrative proceedings consistent with this opinion.

**IT IS SO ORDERED**.


Dated: October 13, 2006

_____

THOMAS J. WHELAN
United States District Judge
Southern District of California

05cv0546